UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

GARY RENELIQUE,

                            Plaintiff,

        vs.                                9:03-CV-525
                                                  (C.J. Scullin)

GLENN GOORD, et al.,

                            Defendants.

_____

APPEARANCES                   OF COUNSEL

GARY RENELIQUE
Plaintiff pro se

ELIOT SPITZER                   STEVEN H. SCHWARTZ
Attorney General of the            Asst. Attorney General
State of New York

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Frederick J. Scullin, Jr., Chief United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

     In this amended civil rights complaint (Dkt. No. 18), plaintiff alleges that some

of the defendants failed to protect him from the sexual assault of another inmate.

Plaintiff also alleges denial of proper medical care; "retaliation" for the filing of

grievances; assault; confiscation of property; and verbal abuse. In the preliminary

statement of plaintiff's amended complaint, he alleges that defendants have also

violated his rights under the "American Disability Act."[1]  Plaintiff seeks declaratory, injunctive and substantial monetary relief.

Presently before the court is a motion for summary judgment pursuant to FED. R. CIV. P. 56, filed by defendants Goord, Wright, LeClaire, Knapp-David, Van Buren, Iritz, Ferrari, and Stolenberg.[2] (Dkt. No. 59).  Defendants Nader[3] and Flesn[4] have filed a motion to dismiss this action pursuant to FED. R. CIV. P. 4(m) for failure to timely effect service upon them. (Dkt. No. 79).  Because this court will recommend granting the motion for summary judgment and dismissing the complaint in its entirety as against all defendants, the motion pursuant to Rule 4(m) may be denied as moot.

## DISCUSSION

### 1.    <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving  party

---

[1] The court assumes that plaintiff is referring to the Americans with Disabilities Act, 42 U.S.C. § 12131.

[2] The correct spelling of this defendant's name is Stoltenberg.

[3] The correct spelling of this defendant's name is Mader.

[4] The correct spelling of this defendant's name is Fresn.

has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)(citations omitted).  However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)(citation omitted).

## 2.   **Facts and Procedural History**

Plaintiff originally filed a complaint in this action naming 67 defendants and consisting of 245 paragraphs. (Dkt. No. 1).  On May 5, 2003, Chief Judge Scullin found that the original complaint did not comply with FED. R. CIV. P. 8 & 10 and ordered that plaintiff file an amended complaint or risk dismissal of his action. (Dkt. No. 4).  Plaintiff filed his amended complaint on August 27, 2003. (Dkt. No. 18).  The court accepted the amended complaint and ordered service on September 11, 2003. (Dkt. No. 19).

Plaintiff's amended complaint names 13 defendants: Goord, Wright, LeClaire, Knapp-David, Van Buren, Marlow, Iritz, Kluwe, Ferrari, McKenzie, Mader, Fresn,

3

and Stoltenberg.  Initially, plaintiff was only successful in serving eight of the thirteen

defendants.  Two defendants, Mader and Fresn were served on June 27, 2005. (Dkt.

Nos. 76, 77).  Three defendants remain unserved: Lieutenant T. Malow[5]; Dr. T.

Kluwe; and McKenzee.[6]

The amended complaint contains seven causes of action, however, these claims

are not clearly separated.  The court will attempt to state plaintiff's different claims

with reference to the paragraphs of the amended complaint:

1.  On March 7, 2001, defendant Fresn failed to protect plaintiff from a sexual assault by another inmate and then denied plaintiff's request to be examined by a doctor after the assault. Amended Complaint (AC) ¶¶ 7-10, 19-20.

2.  Plaintiff alleges that between 2001 and 2003, he filed complaints and grievances with defendants Goord, Wright, LeClaire, Knapp-David, and Van Buren, but has been subjected to "retaliation" as a result. AC ¶¶ 11-15.

3.  Defendant Knapp-David transferred plaintiff out of Bare Hill Correctional Facility, knowing that the other facilities to which plaintiff was being transferred could not accommodate his handicap. AC ¶¶ 16-17. Plaintiff also claims that he wrote to defendant Van Buren complaining about a head trauma that was never addressed.

4.  Defendant Marlow failed to report the sexual abuse incident. AC ¶¶ 21-22.

5.  On March 29, 2001, defendant Iritz began investigating the sexual abuse incident, but this investigation resulted in plaintiff's placement in the

---

[5] The correct spelling of this defendant's name is Marlow.

[6] The correct spelling of this defendant's name is McKenzie

Special Housing Unit (SHU) Protective Custody from March 29, 2001 until plaintiff was transferred to Franklin Correctional Facility on April 25, 2001. AC ¶¶ 23-24.

6.    On November 5, 7, and 28, 2000, defendant Kluwe failed to recommend corrective surgery for plaintiff's head trauma and failed to treat plaintiff for various other ailments. AC ¶¶ 25-26.

7.    Defendant Ferrari also denied plaintiff proper medical care for multiple ailments, including his head trauma, spine injuries, paralysis, breathing complications, amnesia, seizure disorder, vision problems, knee problems, hemorrhoids, left ear problems, lower abdominal problems, and ankle problems. AC ¶ 28.

8.    On September 7, 2000 and March 13, 2001, defendant McKenzie refused to schedule plaintiff for a doctor's appointment, thus, denying plaintiff the ability to obtain proper medical care. AC ¶ 29.

9.    On November 26, 2001, defendant Mader allegedly assaulted plaintiff by striking him in the head, neck, back, and lower abdomen. AC ¶ 30.

10.   Plaintiff claims that on November 26, 2001, defendant Mader also confiscated plaintiff's "legal article" and his "copy cards." AC ¶ 31.

11.   On February 2, 2002, defendant Stoltenberg "discriminated" against plaintiff by using "abusive language," resulting in humiliation and embarrassment as well as threats by other inmates. AC ¶¶ 32-36.

Some of the incidents alleged in the amended complaint occurred while plaintiff was incarcerated at Bare Hill Correctional Facility between November 18, 1999 until April 25, 2001. Defendants' Ex. L.  The other incidents alleged in the amended complaint occurred while plaintiff was incarcerated at Collins Correctional Facility from January 29, 2002 until April 2, 2002. *Id.*  Defendants have submitted affidavits from some of the defendants, copies of plaintiff's letter-complaints, and defendants'

5

responses to these administrative complaints.  Defendants have also submitted

plaintiff's medical records, consisting of entries in plaintiff's Ambulatory Health

Record (AHR) and a report by a consulting gastroenterologist that examined plaintiff

on April 12, 2004.

Defendants make various arguments in support of dismissal of the complaint,

including failure to timely serve the complaint, failure to exhaust plaintiff's

administrative remedies,[7] and arguments on the merits of plaintiff's claims.

## 3.   <u>Service of Process</u>

The Federal Rules require that a defendant be served within 120 days of filing

the complaint. FED. R. CIV. P. 4(m).  The failure to serve a defendant within 120 days

of filing the complaint may be a ground for dismissal of the complaint, unless good

cause is shown for an extension of that time. *Id.*  It is true that a pro se, in forma

pauperis plaintiff may rely upon the Marshal to properly serve the summons and

complaint. *Romandette v. Weetabix*, 807 F.2d 309, 311 (2d Cir. 1986).

There is support for the proposition that, so long as a pro se plaintiff has

properly identified the defendant, the Marshal's failure to effect service automatically

constitutes good cause. *See Ruddock v. Reno*, 104 Fed. Appx. 204, 206-207 (2d Cir.

---

[7] Defendants have withdrawn Point III in their Memorandum of Law which argued that the entire complaint should be dismissed based on the "total exhaustion" rule. (Dkt. Nos. 64, 66).  The Second Circuit has specifically held that there is no "total exhaustion" rule in section 1983 cases. *See Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004).

2004)(citations omitted).  Although *Ruddock* was an "unpublished decision," the other Circuit cases cited by the Second Circuit in *Ruddock* show support for this assertion. *Ruddock*, however, was a case against ***federal*** defendants, and the court reasoned that it would not be overly burdensome for the Marshal to obtain a current business address from the Department of Justice, since both work for the same employer. *Id.* at 207 (quoting *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990).  The court in *Sellers* commented that if the Marshal could not obtain the current business address from the Department of Justice, a pro se inmate could not reasonably be expected to obtain an address from the Bureau of Prisons *Id.*

In this case, defendants Marlow, Kluwe, and McKenzie, employees of the New York State Department of Correctional Services (DOCS) have never been served. This court recently allowed service upon defendants Mader and Fresn over defendants' objections. (Dkt. Nos. 72, 73).  Defendants Mader and Fresn have made a separate motion to dismiss the complaint based upon the failure to ***timely*** serve the summons and amended complaint. (Dkt. No. 79).  The reason that defendants Marlow, Kluwe and McKenzie were not served was explained in a letter, dated November 3, 2003 from the Inmate Records Coordinator at Bare Hill Correctional Facility. (Dkt. No. 33 at 2).  The Summons and Complaints were being returned to the Marshal with an explanation that defendants McKenzie, Kluwe, and Marlow were no longer employed at Bare Hill, and defendant Mader was away on active military duty for "an

undetermined amount of time." *Id.*

Defendants Mader and Fresn were ultimately served because on March 29, 2005, plaintiff requested the court's assistance in having the Marshal make a "third" attempt at serving defendants Mader and Flesn. (Dkt. No. 72). I ordered the Clerk of the Court to issue plaintiff additional blank forms so that he might request the Marshal to serve these two defendants. *Id.* As a result, these two defendants were served. (Dkt. Nos. 76, 77).

Since this court allowed another attempt at serving these defendants, and they were successfully served as a result, I will not recommend dismissal for failure to timely serve the complaint. Because I am recommending dismissal of the entire complaint on alternate bases, I will recommend that defendants' Mader and Fresn's motion to dismiss be denied as moot.

Plaintiff did not, however, request the court's assistance with respect to defendants Marlow, Kluwe, and McKenzie, although it is clear that he was aware of how to do so, and did so in the case of defendants Mader and Fresn. Therefore, this court will recommend dismissal as to these three defendants due to plaintiff's failure to timely serve process. Although such a dismissal is generally without prejudice, because this court is recommending dismissal on the merits of the summary judgment motion as to all defendants, the dismissal as against these three defendants should ultimately be with prejudice.

8

**4.     Eleventh Amendment**

The court notes that the amended complaint states that plaintiff is suing

defendants in their individual and ***official capacities***.  It is now well-settled that the

state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64

F.3d 810, 815 (2d Cir. 1995)(citing *Will v. Michigan Department of Police*, 491 U.S.

58, 71 (1989)).  This rule extends to agencies of the state such as DOCS and to actions

against state officers in their official capacities. *Will v. Michigan Dep't of State Police*,

491 U.S. 58, 64 (1989); *Yorktown Medical Laboratory v. Perales*, 984 F.2d 84, 87 (2d

Cir. 1991).  The rule applies whether the court is considering Eleventh Amendment

immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  Thus, to the

extent that the complaint seeks ***damages*** against defendants in their "official

capacities", the complaint may be dismissed on Eleventh Amendment grounds.

**5.     Exhaustion of Administrative Remedies**

Defendants argue that plaintiff has not exhausted his administrative remedies as

to some of his claims as required by the Prison Litigation Reform Act, (PLRA), 42

U.S.C. § 1997e(a).  It is true that the PLRA exhaustion requirement applies to ***all***

***inmate suits about prison life***, whether they involve general circumstances or

particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v.*

*Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).  The Second Circuit has also held,

however, that the exhaustion requirement is an affirmative defense, not a jurisdictional

prerequisite, and there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004)(remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004)(whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004)(complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP. CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (NYCRR).  The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill*, 380 F.3d at 682.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* ¶ 701.7(a)(1).  An adverse decision of the IGRC

may be appealed to the Superintendent of the Facility. *Id.* § 701.7(b).  Adverse

decisions at the Superintendent's level may be appealed to the Central Office Review

Committee (CORC). *Id.* § 701.7(c).  Time deadlines apply at all levels of the process,

but exceptions to any of the deadlines may be made based on "mitigating

circumstances." *Id.* § 701.1(a)(1).  An inmate must appeal any denial of his grievance

to the highest available administrative level. *Martinez v. Williams*, 349 F. Supp. 2d

677, 682 (S.D.N.Y. 2004).

There is also an expedited process for the review of complaints of inmate

harassment or other misconduct by corrections officers or prison employees. 7

NYCRR § 701.11.  Under this procedure, the inmate may (but is not required to) report

the misconduct to the employee's supervisor. *Id.* § 701.11(b)(1).  The inmate then files

a grievance under the normal procedures outlined above, but all grievances alleging

employee misconduct are given a grievance number, and sent immediately to the

Superintendent for review. *Id.* § 701.11(b)(2).  Under the regulations, the

Superintendent or his designee shall determine immediately whether the allegations, if

true, would state a "bona fide" case of harassment, and if so, shall initiate an

investigation of the complaint, either "in-house", by the Inspector General's Office, or

by the New York State Police Bureau of Criminal Investigations. *Id.* § 701.11(b)(3)-

(b)(4).  An appeal of the adverse decision of the Superintendent may be taken to the

CORC as in the regular grievance procedure. *Id.* § 701.11(b)(6)-(b)(7).  A similar

11

"special" procedure is provided for claims of discrimination against an inmate. *Id.* §
701.12.

Defendants in this case argue that the claims in the amended complaint, labeled
first, fourth, fifth, sixth, and seventh causes of action should be dismissed in whole or
in part due to plaintiff's failure to exhaust his administrative remedies.  Defendants
have submitted the affidavit of Thomas G. Eagen, Director of the IGP.  Attached to
Mr. Eagen's affidavit as Exhibit 1 is a list of all the grievances written by plaintiff that
were appealed to the CORC between May 6, 1999 and July 29, 2003.  It appears that
***none*** of the incidents that occurred either at Bare Hill Correctional Facility or at
Collins Correctional Facility were ***ever*** appealed to the CORC if they were brought as
grievances at all.  In fact, it does not appear that plaintiff filed any formal grievances
with respect to any of the claims he raises in his amended complaint.

Plaintiff wrote multitudes of letters rather than filing grievances. Defendants'
Exs. A, B, C, D, E, I.  The exhibits indicate that plaintiff's letters were ***all*** answered
and investigated, and each time, plaintiff was told that he should attempt to resolve his
issues at the facility level. *See e.g.* Defendants' Ex. A at 5 ("In the future, address such
concerns at the facility level.")  Plaintiff did not abide by these admonishments.  It is
unclear whether plaintiff viewed these letters as "grievances," although it is clear from
Mr. Eagen's affidavit and exhibit that plaintiff was familiar with, and did use, the
grievance procedure for many other matters.  This court will not make a specific

12

determination of whether there are special circumstances in this case to excuse the exhaustion requirement since plaintiff's claims fail on the merits in any event as discussed below.

**6.**   **Failure to Protect (Defendants Fresn and Marlow)**

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991)(citation omitted).   An inmate's claim that a defendant's deliberate indifference in protecting him from the violence of other inmates states a claim under section 1983. *Id.* at 113.   In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety.   *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).   The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety.   *Id.* at 837.   The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference.   *Id.*

In this case, plaintiff's first claim states that defendant Fresn failed to protect plaintiff from sexual assault by another inmate.   Plaintiff claims that on March 7, 2001, while he was sleeping in his cell, his cell-mate inserted his finger into plaintiff's

13

rectum.  This incident was investigated by defendant Iritz, and it was determined that it did not happen, and plaintiff ultimately was charged with misbehavior because he took his cell-mate's "men's magazines" and tore them up. Defendant's Ex. A.  In any event, even if the incident had happened as plaintiff alleged, there is no indication that defendant Iritz knew that plaintiff was in danger or disregarded a substantial risk that plaintiff would be assaulted.  Plaintiff merely alleges that he told defendant Fresn *after the incident*.  Thus, any claim of failure to protect must be dismissed.

The only complaint plaintiff makes about defendant Marlow (an unserved defendant) is that defendant Marlow told plaintiff that the officers were not required to report "sexual abuse" incidents and that "given defendant Marlow's statements," he did not report the incident to his immediate supervisor. AC ¶¶ 21-22.  Clearly, plaintiff's claim against defendant Marlow does not allege failure to protect, since plaintiff is complaining about defendant Marlow's actions after the alleged assault, and there is no indication that defendant Marlow knew of or disregarded a serious risk of injury to plaintiff.

The court does note that defendant Marlow was the hearing officer at the disciplinary hearing that occurred after the alleged "sexual assault" incident.[8]  Plaintiff

---

[8] In fact, plaintiff states in the amended complaint that Marlow told plaintiff "on Tape 2001-04(A) 398" that his officers were not required to report incidents of sexual abuse. AC ¶ 21.  The court assumes that this refers to the tape of plaintiff's disciplinary hearing.  The hearing transcript has been included in Defendants' Ex. A.

14

was charged by defendant Fresn with refusing a direct order, making threats, and stealing or vandalizing another inmate's property. Defendants' Ex. A at 6.  The misbehavior report states that at 6:30 a.m. on March 8, 2001, plaintiff approached the guard station and began yelling that his "cube"[9] mate had "touched" him. Defendants' Ex. A at 7.  Plaintiff was told to lower his voice, but instead, he continued to threaten that if the officer did not move plaintiff's cube mate, plaintiff would "take care of it." *Id.*  Plaintiff then went back to his cell and came out with a stack of magazines and began to tear them up and throw them in a garbage can. *Id.*

The misbehavior report further states that defendant Fresn ordered plaintiff to stop, but plaintiff continued his actions.  The report states that defendant Fresn reported the incident to the sergeant, and two officers came to escort plaintiff to SHU as a result of the incident. *Id.*  The Log Book confirms the time that the officers came to escort plaintiff off the unit. *Id.* at 10.

It is unclear what constitutional violation plaintiff might be claiming by alleging that defendant Marlow told plaintiff that officers were not required to report the incident or by not reporting the incident himself, assuming that plaintiff's statement of facts is true.[10]  Plaintiff's claims were investigated after he was moved out of his cell

---

[9] The parties refer to an inmate's housing area as a "cube," rather than a cell.

[10] A review of the transcript of the disciplinary hearing of March 13, 2001 shows that ***at no time during the hearing*** does it appear that defendant Marlow stated that his officers were not required to report incidents of sexual abuse. Defendants' Ex. A at 12-31.  The court must point out that the transcript is largely useless because most of plaintiff's testimony appears as "inaudible" on

into the SHU, thus any actions by defendant Marlow had absolutely no effect on plaintiff.  In fact, it appears from all the evidence that defendant Marlow was not involved with plaintiff until March 13, 2001 when he presided over plaintiff's disciplinary hearing.  The disciplinary hearing involved plaintiff's conduct in destroying his cube mate's magazines and failing to follow orders to stop, not plaintiff's claims of sexual abuse.

It would not be unusual or improper, given the subject of the hearing, that defendant Marlow was not responsible for reporting plaintiff's allegations of sexual abuse because these allegations had nothing to do with whether plaintiff failed to abide by a direct order or whether plaintiff threatened his cube mate and destroyed his magazines, regardless of *why* plaintiff might claim that he engaged in that behavior.  Even if defendant Marlow violated some state law, procedure, rule, or regulation, this conduct alone would not rise to the level of a constitutional violation. *See Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985)(a State employee's failure to conform to State law does not in itself violate the constitution and is not alone actionable under section 1983).  Plaintiff does not and, as discussed below, it does not appear that he could challenge the constitutionality of his disciplinary hearing.  Even if defendant Marlow had been served, this court would have recommended dismissal of the action against him, and therefore, this court recommends dismissal of the action with

---

the transcript.  However, defendant Marlow's statements do not contain many "inaudible" sections.

prejudice against this defendant.

7.   **Due Process**

Plaintiff does not really make any specific due process claims, however, given the liberality with which pro se complaints are treated, this court has broadly interpreted the statements in plaintiff's amended complaint to allege all possible constitutional issues.

In order to begin a due process analysis, the court must determine, *inter alia*, that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

*Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest.  *Id*. at 484.  The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections.  *Id*. at 485 (citing *Wolff*, 418 U.S. at 571 n.19; *Baxter v. Palmigiano*, 425 U.S. 308, 323 (1976)).  Applying this standard to the facts in *Sandin*,

the Court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the ***length*** of the inmate's sentence was affected. *Id.* at 486-87.

The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000). In *Colon*, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did ***not*** meet the atypical requirement was ***101 days***. *Id.* at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90(2d Cir. 1999)). Although the court made clear in a footnote that it did not exclude the possibility that confinements of less than 101 days could not be shown to be atypical "on a record more fully

18

developed than the one in *Sealey*",[11] it was clear from the decision that a ***30 day confinement*** would ***not*** suffice to create a liberty interest.

As stated above, plaintiff does not specifically challenge his disciplinary hearing.  In any event, however, the court would point out that plaintiff's disciplinary hearing resulted in a total of 30 days confinement, 5 days of pre-hearing confinement and 25 days of confinement after defendant Marlow found plaintiff guilty of two of the misbehavior charges. Defendants' Ex. A at 6.  Plaintiff's disciplinary penalty also included the loss of various privileges.  Plaintiff does allege any additional deprivations that would rise to the level of atypical or significant deprivations.  Thus, plaintiff had no liberty interest in remaining free from the confinement to which he was subjected as a result of the disciplinary hearing.  Additionally, it appears that plaintiff was afforded notice and an opportunity to be heard at his disciplinary hearing, together with the ability to call witnesses.  Thus, plaintiff's due process rights were not violated.

Plaintiff alleges in his amended complaint that defendant Iritz investigated plaintiff's complaint of sexual abuse, but that this investigation resulted in plaintiff's placement in SHU between March 29, 2001 and plaintiff's transfer to Franklin Correctional Facility on April 25, 2001. AC ¶¶ 23-24.  The court assumes that plaintiff is first attempting to allege a due process violation against defendant Iritz.  It should

---

[11] *Colon*, 215 F.3d at 232 n.5.

first be noted that thirty days of plaintiff's confinement were due to the guilty finding after plaintiff's disciplinary hearing, *not* due to the investigation of the sexual abuse incident.  According to the records contained in Defendants' Ex. A, the disciplinary penalty lasted until April 7, 2001.  Therefore, any confinement between March 29, 2001 and April 7, 2001 was still the result of the disciplinary hearing.  As stated above, there was no due process violation as a result of the disciplinary hearing.

Defendants have included a copy of defendant Iritz's report dated March 29, 2001. Defendants' Ex. A at 1-2.  The report states that it covers, not only plaintiff's "sexual abuse" allegations, but also states that on February 28, 2001, defendant Iritz was assigned to investigate a letter that plaintiff had written to the Commissioner. Defendant Iritz notes that the complaint by plaintiff "makes several allegations over several months." *Id.* at 1.  Defendant Iritz notes that many of the issues raised by plaintiff were "addressed in previous investigations", and therefore, the only issue that defendant Iritz discussed was the "sexual abuse" issue. *Id.*

Defendant Iritz's investigation showed that he interviewed plaintiff, who told him that he was asleep at approximately 11:30 p.m. on March 2, 2001 when his cube mate approached plaintiff, pulled down his clothing and inserted his finger into plaintiff's rectum. *Id.*  Plaintiff also told Iritz that the individual in question was a pervert and continually read pornography.  Defendant Iritz interviewed other inmates, including the inmate that plaintiff accused of the misconduct, all of whom stated that

nothing happened in the cubicle on the night in question. *Id.*

Defendant Iritz stated in his report that plaintiff awoke the ***next morning*** and began yelling and threatening his cube mate as indicated in defendant Fresn's misbehavior report. Defendant Iritz also stated that plaintiff was medically examined "the day in question" upon plaintiff's admission to SHU after the incident that led to the misbehavior report, and that there was no indication of any injuries of a sexual nature, but he was treated a few days later for hemorrhoids. Defendant Iritz stated that no inmates, even those living close to plaintiff's cubicle saw any struggle. Defendant Iritz speculated based on the information he received, that plaintiff may have dreamed that this incident occurred, given that he did not report the incident until the morning after it allegedly happened. *Id.*

Defendant Iritz also stated that the inmates who he interviewed were "sympathetic" to plaintiff "because of his diminished physical and mental capabilities",[12] and even plaintiff's cube mate indicated that he never had a problem with plaintiff until the morning plaintiff awoke and accused him of the sexual assault, however, plaintiff's cube mate did acknowledge that plaintiff did not approve of the cube mate reading "men's magazines." *Id.* at 1-2. Defendant Iritz also stated in his report that plaintiff was thankful to be placed in administrative segregation. Based on his finding that plaintiff's actions could ultimately result in a violent reaction from

---

[12] Plaintiff has a variety of medical impairments that he refers to as a "disability."

other inmates and the fact that plaintiff was "physically feeble", defendant Iritz

recommended that plaintiff be housed in administrative segregation.

The court would point out that defendant Iritz only "recommended" that

plaintiff be placed in administrative segregation based upon his investigation of the

incident in question.  Defendants have included the formal recommendation by

defendant Iritz as Exhibit G.  This recommendation indicates that plaintiff would be

afforded a hearing on the issue at which he could present witnesses. *Id.*

Plaintiff was afforded a hearing on the administrative segregation

recommendation.  The transcript of the hearing has been filed as Defendants' Ex. H.

The hearing was conducted Captain P. Gonyea.  Plaintiff was allowed to comment

upon the administrative segregation placement, and apparently signed a form agreeing

to the placement, although plaintiff's comments are often unclear. *Id.* at 4-6.  Plaintiff

does not claim that the administrative segregation hearing was defective and has not

named Captain Gonyea as a defendant.  The court also notes that in plaintiff's letter to

defendant Goord, dated March 19, 2001, plaintiff stated that he ***wanted*** to be in "PC"

until he was transferred. Defendants' Ex. A at 3-4.

By plaintiff's own admission, defendant Iritz's recommendation resulted in

plaintiff's administrative confinement for less than one month.  Based upon the short

length of time of confinement and the lack of any atypical and significant deprivation,

this court finds no liberty interest in remaining free from the administrative

22

segregation to which he was subjected prior to his transfer to Franklin Correctional Facility.

Even if plaintiff claimed somehow that defendant Iritz did not investigate the incident properly, the improper handling of a grievance or other complaint does not implicate constitutional protections.  Plaintiff has no constitutional right to an investigation. *See e.g. Haines v. Peters*, 95 C 1543, 1995 U.S. Dist. LEXIS 16082, * 7 (N.D. Ill. 1995)(inmate had no right to an investigation, and the failure to investigate did not cause plaintiff's injury).  Thus, to the extent that the amended complaint can be read to allege the failure to properly investigate, it may also be dismissed as against defendant Iritz on that basis.

## 8.   <u>Retaliation and Personal Involvement</u>

Plaintiff claims that between 2001 and 2003, he filed complaints and grievances with defendants Goord, Wright, LeClaire, Knapp-David, and Van Buren, but has been subjected to unspecified "retaliation" as a result.

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation

23

are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.*
(citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).[13]

The court in *Dawes* stated that in order to survive **summary dismissal**, the plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted).  Although defendant argues that the retaliatory action must also have chilled plaintiff's exercise of his First Amendment rights, subsequent Second Circuit cases have held that, in a prison context, all that is required is that the adverse conduct by defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).  In *Gill*, the court held that this objective test applied, even where a particular plaintiff was ***not subjectively deterred*** and continued to file grievances and lawsuits. *Id.*

In this case, any claim of retaliation by plaintiff is completely conclusory.  He

---

[13] The court would note that *Dawes* did not create a "heightened pleading standard", and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). *See Phelps v. Capnolas*, 308 F.3d 180, 187 (2d Cir. 2002).  The decision in *Phelps* resulted from a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6), and the court was considering only the face of the complaint.  This case comes before the court upon a motion for summary judgment, thus, this case is distinguishable from a situation in which only the complaint is being examined.

first states that he filed complaints and grievances for a two year period, but was subjected to unspecified retaliation. AC ¶ 11. Plaintiff never states to what retaliation he refers, thus, any claim of retaliation may be dismissed in its entirety. In subsequent paragraphs plaintiff lists many instances in which defendants Goord, Knapp-David, LeClaire, and Wright **responded** to plaintiff's complaints.[14] Plaintiff does claim that defendant Goord always referred the complaints to other officials for response.

The court would point out that these defendants are supervisory officials, and defendant Goord was the Commissioner of DOCS. It would be impossible for defendant Goord, who was in Albany, to individually investigate and respond to every inmate's complaint at every facility in New York State that defendant Goord supervises. The fact that he referred plaintiff's complaints to subordinate officials does not rise to the level of any violation, let alone a constitutional violation. Defendants have submitted multitudes of letters written by plaintiff to Goord and other supervisory officers. The exhibits also contain responses by these officials, indicating that plaintiff's complaints were forwarded to the appropriate person for investigation, and telling plaintiff that he must attempt to resolve his complaints through proper channels. Plaintiff disregarded these admonishments and continued to write letters to the supervisory officials. Defendants' Exs. B-E, I. Defendants Wright, Knapp-David, and Van Buren have filed affidavits in this case indicating the steps

---

[14] Plaintiff lists the dates he received responses from these defendants. AC ¶¶ 13-15.

they took to make sure that plaintiff's complaints were addressed.

Personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson*, 568 F.2d at 934. The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973).

In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id*. A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id*. Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id*. Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id*.

It has been held that the allegation that an official ignored a prisoner's letter of protest and request for an investigation is insufficient to establish personal involvement in the alleged violation. *Higgins v. Artuz*, 94 Civ. 4810, 1997 WL 466505

at *1, *7 (S.D.N.Y. Aug. 14, 1997) (citations omitted).  In this case, it is clear that

defendants did not ignore plaintiff's letters of protest and attempted to refer plaintiff's

complaints to others that could better investigate and resolve plaintiff's alleged

problems.  Thus, the referral of plaintiff's letters to subordinate officers for

investigation and response does not make the supervisory official personally

responsible for any of plaintiff's allegations. *See Sealey v. Giltner*, 116 F.3d 47, 51

(2d Cir. 1997).  The fact that plaintiff ultimately disagrees with the investigation and

the response does not make the supervisor liable for constitutional violations.

Plaintiff alleges that he wrote to defendant Knapp-David and that she

transferred plaintiff out of Bare Hill to other facilities that could not accommodate his

"handicap."  AC ¶¶ 16-17.  Defendant Knapp-David has submitted an affidavit stating

that although she is the Director of Classification and Movement for DOCS, she is not

involved in making transfer decisions for individual inmates and had **no** involvement

in any of plaintiff's transfer decisions. Knapp-David Aff. ¶¶ 1, 5-6.  Defendant Knapp-

David refers to plaintiff's claim that she transferred plaintiff to a facility that could not

accommodate him because he was required to be housed on the first floor of a facility

on the "flats," however, defendant Knapp notes that none of plaintiff's letters to her

mention this restriction.  The fact that plaintiff wrote to defendant Knapp-David, but

was transferred notwithstanding his complaints, does not make this defendant

personally responsible for any constitutional violations plaintiff associates with his

transfer.

The court does note that plaintiff was ultimately evaluated for transfer to a one-floor facility. In a letter, written by defendant Wright, dated February 28, 2002, he states that plaintiff's ambulation problems were noted after he was transferred to Collins Correctional Facility, and a transfer order was submitted to allow the transfer to a one-floor facility, having an inpatient infirmary component. Defendants' Ex. B at 43. Once again, defendant Wright referred plaintiff to the health care staff at the facility in order to resolve his medical issues.

Plaintiff claims that he wrote to defendant Van Buren regarding a head trauma that was never addressed. AC ¶ 3. Defendant Van Buren has also submitted an affidavit. This defendant is the Regional Health Services Administrator for DOCS and is ***not a medical doctor***. Van Buren Aff. ¶ 1. Although defendant Van Buren states that he investigates claims relating to inmates' medical issues, the only function he performs is to follow up with the facility's Nurse Administrator to make sure that an inmate is receiving the medical care that the medical personnel believe is appropriate. *Id.* ¶ 4. Defendant Van Buren makes ***no*** decisions regarding the proper course of treatment for an inmate. *Id.* Thus, plaintiff's letters to defendant Van Buren do not make this defendant personally responsible for any denial of care.

## 9.   **Medical Care**

In order to state a claim based on constitutionally inadequate medical treatment,

28

the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference may be manifested by prison doctors in their response to the inmate's needs or by prison guards or non-medical personnel intentionally denying or delaying access to medical care. *Id.* at 104-105. *See Dawkins v. Jones*, 03 Civ. 68, 2005 U.S. Dist. LEXIS 1197, *52-53 (S.D.N.Y. Jan. 31, 2005).

The court would point out that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)); *Jackson v. Fair*, 846 F.2d 811, 817-18 (1st Cir. 1988) Additionally, negligence by physicians, even amounting to malpractice does not become a constitutional violation because the plaintiff is an inmate. *Estelle*, 429 U.S. at 107. *See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under section 1983). Thus, any claims of malpractice, or ***disagreement with treatment*** are not actionable under section 1983.

In this case, plaintiff has various claims relating to the medical care he was given. He has named both doctors and non-medical personnel. However, none of plaintiff's claims have merit. First, plaintiff alleges that defendant Fresn (a non-

medical defendant) denied plaintiff's request to see a doctor on the "night" of the sexual assault incident. The court would point out that the investigation into this incident showed that plaintiff alleged that the incident allegedly took place at 11:30 p.m., but plaintiff did not report it until 6:30 a.m. when he awoke. There is no indication that defendant Fresn denied plaintiff the opportunity to be examined. In any event, plaintiff was examined prior to his admission to SHU on March 8, 2001. Defendants' Ex. J at 3. An entry in plaintiff's Ambulatory Health Record dated March 8, 2001 states that although plaintiff was complaining of rectal bleeding, there was no active bleeding on that examination, and plaintiff's examinations showed that plaintiff had hemorrhoids. *Id.* He was given a prescription for the hemorrhoids. *Id.* It is clear that plaintiff was examined in a timely fashion after the alleged incident, and there is no mention of sexual abuse. Thus, any denial of medical care claims may be dismissed as against defendant Fresn.

Plaintiff claims that on November 5, 7, and 28, 2000, defendant Kluwe failed to recommend corrective surgery for plaintiff's head trauma and failed to treat plaintiff for various other ailments. AC ¶ 25-26. Plaintiff also alleges that Dr. Ferrari denied plaintiff proper medical care for a multitude of medical problems. Plaintiff alleges that on March 29, 2001, Dr. Ferrari prescribed only hemorrhoidal ointment after the sexual abuse incident. Dr. Ferrari has submitted an affidavit. Dr. Ferrari notes that contrary to plaintiff's allegations, he only examined plaintiff twice, once on March 5,

2001 (before the incident) and once on March 8, 2001 (the morning after the incident). Ferrari Aff. ¶ 3.

The medical records support Dr. Ferrari's statements.  Dr. Ferrari examined plaintiff the morning after the alleged sexual assault incident.  Dr. Ferrari states that he did not notice any bleeding and instead noticed an external hemorrhoid, for which he prescribed medication. Ferrari Aff. ¶ 5.  Dr. Ferrari states that plaintiff did not claim during the March 8, 2001 examination that he had been the victim of sexual abuse, nor did Dr. Ferrari observe any evidence of sexual abuse. *Id.* ¶ 6.  Dr. Ferrari states that he would have noted such a claim by plaintiff on the AHR entry. *Id.*  Alternatively, if Dr. Ferrari had seen evidence of sexual abuse (even if plaintiff had not mentioned the incident), the doctor would have noted his observations of the evidence of abuse in the AHR. *Id.* ¶ 6

Dr. Ferrari states that he did not treat plaintiff for any of the other ailments that plaintiff mentions in his amended complaint. *Id.* ¶ 7.  Finally, Dr. Ferrari comments on plaintiff's claim that he was denied the opportunity to see a doctor by defendant Fresn immediately after the incident. *Id.* ¶ 8.  Dr. Ferrari states that Bare Hill did not have a physician on duty ***at night*** at that time, and thus, plaintiff could not have been seen by a physician at the time that he says he requested an examination.  However, it is clear that he did see Dr. Ferrari the next day.  There is no evidence that Dr. Ferrari was deliberately indifferent to plaintiff's serious medical needs.

Although plaintiff claims that on November 5, 7, and 28, 2000, Dr. Kluwe failed to recommend "corrective surgery" for plaintiff's head trauma and refused to treat him for other ailments, a review of the AHR entries for the dates in question show that plaintiff's claims are totally unfounded and it appears that at worst, plaintiff disagrees with the treatment that was prescribed for him. Defendants' Ex. J at 9-11. The court notes that Dr. Kluwe's AHR entry for November 6, 2000 indicates that plaintiff was refusing to take medication that had been prescribed for him and was also refusing to sign the refusal form. *Id.* Plaintiff has not indicated anywhere to what "corrective surgery" he is referring nor has he alleged anything that would approach deliberate indifference with respect to his medical care.

Plaintiff also alleges in a conclusory manner that defendant McKenzie (unserved) refused to schedule plaintiff for a doctor's appointment on September 7, 2000 and March 13, 2001. AC ¶ 29. The court would first point out that a review of the AHR shows that there is a lengthy entry for September 7, 2000, including a notation by Nurse McKenzie to order a "chart screening" for an EEG. Defendants' Ex. J at 15. Although there appears to be no entry for March 13, 2001, an entry for March 16, 2001 by Nurse McKenzie shows that she rescheduled plaintiff for an appointment with Dr. Ferrari for March 26, 2001. Thus, there is no support for plaintiff's assertions against Nurse McKenzie and no evidence of any deliberate indifference.

Finally, this court notes that defendants have submitted a sealed medical report

regarding this plaintiff's mental status.  Without further discussing the content of this report, it supports this court's finding that plaintiff's claims of deliberate indifference are unsupported.

**10.   <u>Verbal Abuse</u>**

Plaintiff makes one claim against defendant Stoltenberg. AC ¶¶ 32-36.  Plaintiff claims that this defendant "discriminated" against plaintiff by using abusive language, resulting in humiliation and embarrassment.  Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)(threats or verbal harassment without injury, "although indefensible and unprofessional," do not rise to the level of constitutional violations).  Thus, plaintiff cannot sustain a claim under section 1983 based solely upon defendant Stoltenberg's alleged verbal abuse.

**11.   <u>Property Claims</u>**

Plaintiff alleges that on November 26, 2001, defendant Mader confiscated a legal article and some "copy cards."  The deprivation of an inmate's property, whether intentional or unintentional, without more, is ***not actionable*** under section 1983 as long as the state has an adequate post deprivation procedure available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See*

*Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996); *Love v. Coughlin*, 714 F.2d 207, 209 (2d Cir. 1983); *see also* N.Y. CT. CL. ACT § 10(6) (McKinney 1998).  To the extent that plaintiff claims a due process violation as the result of the confiscation of his property, that claim may be dismissed.  Thus, even if plaintiff's allegation were true, the confiscation of plaintiff's property does not, in itself, rise to the level of a constitutional violation.[15]

## 12.   <u>Assault</u>

In one sentence, plaintiff states that on November 26, 2001, defendant Mader assaulted plaintiff by striking him in the head, neck, back, and lower abdomen. AC ¶ 30.  Plaintiff does not appear to have exhausted this claim, although he exhausted a prior claim of threats and assault by a sergeant and corrections officer.  Exhibit 1 to Thomas Eagen's affidavit shows that the appeals of two grievances, one alleging threats and the other alleging assault were filed September 18, 2001 and the CORC disposition was issued on November 28, 2001.  Thus, it is clear that plaintiff knew how to, and did use the grievance procedure to file claims of employee misconduct, however, it appears that he never filed a grievance with respect to the alleged assault

---

[15] To the extent that this claim could be interpreted as a denial of access to courts, it has no merit since in order to make a claim for denial of access to courts, plaintiff must claim that he suffered actual injury to a lawsuit. *Lewis v. Casey*, 518 U.S. 343 (1996).  The ***cause of the injury*** must be inadequacy of the access.  *Id.* at 351.  Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials.  *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998)(quoting *Lewis v. Casey*, 518 U.S. at 353).  Plaintiff in this case has not met any of these requirements.

that occurred on November 26, 2001, or at least, if he did file a grievance, he never

appeal a denial of that grievance to the CORC, completing the exhaustion of

administrative remedies.

There is no indication that defendants prevented plaintiff from filing a

grievance or that plaintiff was unaware of the procedures.  Therefore, there appears to

be no excuse for plaintiff's failure to exhaust his administrative remedies, and the

claim may be dismissed on that basis.  The court also notes that curiously, in a letter to

defendant Goord that appears to have been written by plaintiff in early December of

2001, plaintiff complained about an assault by Sergeant "Harragan" and Officer

"Cicor" that allegedly occurred in August of 2001, and plaintiff complained about the

alleged assault by another inmate dated November 8, 2001. Defendants' Ex. B at 6.  In

this letter, plaintiff ***never mentioned*** the alleged assault on November 26, 2001 by

defendant Mader.  Since plaintiff claims that the alleged assault by defendant Mader

occurred only a very short time before he wrote the letter, it is hard to believe that

plaintiff would have omitted this claim from the letter.  However, this court will

recommend dismissing this one particular claim without prejudice because there is no

basis for dismissal other than non-exhaustion.

## 13.   Americans with Disabilities Act (ADA)

Title II of the ADA provides that

> Subject to the provisions of this subchapter, no qualified

35

> individual with a disability shall, by reason of such disability
> be excluded from participation in or be denied the benefits of
> the services, programs, or activities of a public entity, or be
> subjected to discrimination by any such entity.

42 U.S.C. § 12132.  The Supreme Court has held that Title II of the ADA applies to state prison inmates, because state correctional facilities are within the statutory definition of "public entities". *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 209-210 (1998).  However, the Second Circuit has held that Title II does ***not*** provide for individual capacity suits against state officials under the ADA. *Garcia v. S.U.N.Y. Health Science Center*, 280 F.3d 98, 107 (2d Cir. 2001).  Thus, to the extent that plaintiff is suing defendants in their individual capacities under the ADA, the complaint may be dismissed.

The Second Circuit has also held that a plaintiff may bring an official capacity action under the ADA, but in order for a plaintiff to maintain a cause of action for monetary damages against the defendants in their official capacities, plaintiff must show that defendants actions were based on discriminatory animus or ill will toward his disability. *Garcia v. S.U.N.Y. Health Science Center*, 280 F.3d 98, 112 (2d Cir. 2001).

To establish discriminatory animus, plaintiff may rely upon the burden-shifting standard articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) or a "motivating-factor analysis" as articulated in *Price Waterhouse v.*

*Hopkins*, 490 U.S. 228, 252-58 (1989). However, if discriminatory animus is not sufficiently alleged, neither the *McDonnell Douglas* nor the *Price Waterhouse* standard need be analyzed.

In this case, plaintiff's claims are vague regarding his alleged "disability". Plaintiff claims that he was transferred to facilities that could not accommodate his "flat ground" requirements. Plaintiff does not state what his specific disability is, and plaintiff was ultimately evaluated for transfer to a "flat-ground facility." The fact that plaintiff may suffer from various physical and mental ailments does not necessarily establish a "disability," and it certainly does not establish that defendants acted with discriminatory animus toward plaintiff in transferring him to any particular facility. Thus, any claims of ADA violations may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 59) be **GRANTED**, and the complaint be dismissed in its entirety as against all defendants, and it is further

**RECOMMENDED,** that the dismissal be **WITH PREJUDICE** as to all defendants except defendant **MADER**, and it is further

**RECOMMENDED,** that the complaint be dismissed **WITHOUT PREJUDICE** with respect to the assault claim stated in paragraph 30 of the amended complaint as against defendant **MADER**, and it is

**RECOMMENDED,** that the dismissal of the complaint as to defendant

**MADER** be **WITH PREJUDICE** for all other claims against this defendant, and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 79) filed on

behalf of defendants **MADER and FRESN** be **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten

days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72.

Dated: September 19, 2005

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge